# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REJEANA M. SILLA, | : | Civil Action No.: 2:20-cv-963 |
| | : | |
| Plaintiff, | : | |
| | : | **CIVIL COMPLAINT** |
| v. | : | |
| | : | |
| HOLDINGS ACQUISITION CO., L.P. | : | |
| d/b/a RIVERS CASINO, | : | Electronically Filed |
| | : | |
| Defendant. | : | |
| _____ | : | |

***JURY TRIAL DEMANDED***

Dated: June 25, 2020

REJEANA M. SILLA
430 TAYLOR STREET
PITTSBURGH, PA 15224
(412) 923-7935
rejeanamsilla@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

REJEANA M. SILLA,                       :       Civil Action No.:
                                        :
                Plaintiff,              :
                                        :
        v.                              :       **CIVIL COMPLAINT**
                                        :
HOLDINGS ACQUISITION CO., L.P.          :
d/b/a RIVERS CASINO,                    :
                                        :
                Defendant.              :       ***JURY TRIAL DEMANDED***
_____

## COMPLAINT

        Plaintiff, ReJeana Silla, an individual, brings this lawsuit and files the following

Civil Complaint against Defendant, Holdings Acquisition Co., L.P. d/b/a Rivers Casino and

alleges the following:

### JURISDICTION AND VENUE

        1.      This Court has original jurisdiction over this matter pursuant to 28 U.S. Code

§ 1331 and § 1343 as it is a civil rights action arising under the laws of the United States.

Plaintiff is alleging violations of her rights under Title VII of the Civil Rights Act of 1964,

as amended 42 U.S.C. §§ 2000e *et seq.* and Title I of the ADA of 1990, *as amended*, ADA

Amendments Act of 2008 (ADAAA), 42 U.S.C.A § 12101.

        2.      This Court also has supplemental jurisdiction over Plaintiff's state law claim

for breach of contract pursuant to 28 U.S.C. § 1367(a), because the district courts shall have

supplemental jurisdiction over any other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

## PARTIES

3.      Plaintiff, ReJeana M. Silla ("Plaintiff" or "Silla"), is an adult individual who resides at 430 Taylor Street, Allegheny County, Pittsburgh, Pennsylvania 15224.

4.      While employed by Defendant, Plaintiff was subjected to **cumulative** harassment, hostility (verbal and physical), discrimination, retaliation, intimidation, embarrassment and adverse employment actions, ultimately leading to Plaintiff's discharge on Sunday, November 10, 2019, after Plaintiff had worked most of her scheduled shift at the Rivers Casino Drum Bar.

5.      Defendant, Holdings Acquisition Co., L.P. d/b/a Rivers Casino ("Defendant" or "Rivers Casino"), is a corporation that owns and operates a casino, leisure club, recreation and entertainment facility. The company is based in Pittsburgh, Pennsylvania, incorporated under the laws of the State of Pennsylvania, with a principal place of business at 777 Casino Drive, Allegheny County, Pittsburgh, Pennsylvania 15212.

6.      Upon information and belief, at all times relevant, Defendant has employed between 500-2000 people.

7.      Upon information and belief, at all times relevant, Defendant has employed over 100 bartenders.

## PROCEDURAL REQUIREMENTS

8.     Plaintiff has satisfied all procedural and administrative requirements set forth under the Americans with Disabilities Act of 1990 (ADA), the ADA Amendments Act of 2008 (ADAAA) and Title VII of the Civil Rights Act of 1964, in that Plaintiff filed an initial charge of disability discrimination and retaliation against Defendant, satisfying the requirements of the Equal Employment Opportunity Commission (EEOC).

9.     While in the state of Pennsylvania, an individual has three hundred (300) days to file a charge with the EEOC, Plaintiff filed with the EEOC on November 13, 2019, and the EEOC filed a charge on February 25, 2020, within one hundred eighty (180) days after the unlawful employment practice occurred.

10.     The EEOC filed issued Plaintiff a Notice of Suit Rights dated March 20, 2020.

## BACKGROUND AND FACTUAL ALLEGATIONS

11.     Plaintiff was hired by the Rivers Casino on June 14, 2019, as a Beverage Bartender. An email was sent to Plaintiff from the Rivers Casino Human Resource (HR) Department upon hiring informing her of the casino's onboarding process and documentation requirements needed from Plaintiff, a copy of which is attached hereto as Exhibit 2.

12.     Plaintiff was required by Defendant to complete the casino's onboarding process, have fingerprints taken, get verified by the PA State Police and obtain her Pennsylvania non-gaming license from the Pennsylvania Gaming Control Board before she could begin her first day of employment.

13.    Once Plaintiff's PA non-gaming license was issued by the PA Gaming Control Board, she received an email on September 3, 2019, from the HR Department to schedule her orientation for September 17, 2019 and September 18, 2019. A copy of the New Hire Orientation (NHO) Information Sheet is attached hereto as Exhibit 2.

14.    The fee for the PA non-gaming license was sixty dollars ($60.00) and was deducted from Plaintiff's first paycheck.

15.    During this time, Plaintiff was employed by MBFGMTW L.P. d/b/a Monterey Bay Fish Grotto (MBFG) located at 1411 Grandview Ave Suite 801, Pittsburgh, Pa 15211. A copy of Plaintiff's W-2 for the pay period beginning June 3, 2019 and ending June 16, 2019, is attached hereto as Exhibit 3.

16.    Plaintiff's first day of employment with Monterey Bay Fish Grotto was on or around April 23, 2019.

17.    Plaintiff was fired from her job as a bartender at Monterey Bay Fish Grotto on August 5, 2019, and Plaintiff filed for Unemployment Compensation (UC) benefits on August 7, 2019. The UC Service Center issued a Notice of Determination as follows, "The claimant's last day of work was[1] [omitted on Exhibit 3 due to error on last day of work]. The claimant was discharged as a result of unsatisfactory work performance. The employer did not provide sufficient to show the claimant did not work to the best of her ability", a copy of which has been attached hereto as Exhibit 3.

---

[1] Plaintiff's last day of actual work for MBFG was on Friday, August 2, 2019, and she was fired when arriving for her scheduled shift on Monday, August 5, 2019, for reasons in addition to that listed on the UC Notice.

18.    The employer, MBFG, filed a Petition for Appeal of the UC Service Center Determination finding Plaintiff eligible for UC benefits, and a Referee Hearing was scheduled and held on October 3, 2019, at the Pittsburgh Referee Office.

19.    The Referee issued a Decision/Order dated October 7, 2019, Findings of Fact (FOF) as follows, "The employer discharged the claimant due to a guest complaint", a copy of which is attached hereto as Exhibit 3.

20.    A charge against MBFGMTW L.P. has also been filed separately with the PHRC in August 2019 and EEOC on December 17, 2019, which has been transferred to the investigation division of both agencies. The EEOC had reopened the case after issuing a Notice of Suit Rights to Plaintiff the same day they issued a Notice of Suit Rights to Plaintiff in this matter against Defendant, dated March 20, 2020.

21.    Plaintiff submitted a request for reconsideration[2] due to facts being inaccurately set forth in the charges against Defendant and fragmented, because Plaintiff was not given a copy of her charge for review before it was filed.

22.    A copy of the EEOC's Intent to Reconsider and Rescinding of Determination for only the charge against Monterey Bay Fish Grotto, is attached hereto as Exhibit 3.

23.    A copy of the letter denying reevaluation of the charge against Defendant is also attached hereto as Exhibit 3.

---

[2] Plaintiff had also requested a request for reconsideration of determination of the charge for the Rivers Casino due to the same reasons set forth in paragraph 18 of this Complaint in addition to the fact that Plaintiff was intimidated during the processing interview for her charge by being threatened with a Right to Sue Notice at the conclusion of her interview if she did not stop trying to revise her charge and explain things. Mary Rose is the first name of the Investigator Supervisor Assistant (ISA), who stated this while conducting the processing interview and further stated that if she had issued a Right to Sue Notice right then, then Plaintiff would not even have a chance to have mediation through the EEOC. This was reported to the EEOC Area Acting Director. *See* Exhibit 3.

24.     The regulations set forth in 29 § 1601.1 contain the procedures established by the Equal Employment Opportunity Commission for carrying out its responsibilities in the administration and enforcement of title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, and the Genetic Information Nondiscrimination Act of 2008.

25.     Section 107 of the Americans with Disabilities Act and section 207 of the Genetic Information Nondiscrimination Act incorporate the powers, remedies and procedures set forth in sections 705, 706, 707, 709 and 710 of the Civil Rights Act of 1964. Based on its experience in the enforcement of title VII, the Americans with Disabilities Act, and the Genetic Information Nondiscrimination Act, and upon its evaluation of suggestions and petitions for amendments submitted by interested persons, the Commission may from time to time amend and revise these procedures.

26.     29 §1600.101 Cross-reference to employee ethical conduct standards and financial disclosure regulation provides, "Employees of the Equal Employment Opportunity Commission (EEOC) are subject to the executive branch-wide Standards of Ethical Conduct at 5 CFR part 2635, the EEOC regulation at 5 CFR part 7201, which supplements the executive branch-wide standards, and the executive branch-wide financial disclosure regulations at 5 CFR part 2634."

27.     Plaintiff's first day of employment for Defendant was on September 17, 2019.

28.     Plaintiff was terminated from her job as a bartender with the Rivers Casino on Sunday, November 10, 2019, after she had worked most of her scheduled shift.

29.    Plaintiff filed a claim for UC benefits in regard to the loss of her job with Defendant. The UC Service Center (UCSC) found Plaintiff eligible for benefits and set forth findings of fact as follows, "The claimant's last day of work was November 10, 2019. The claimant was discharged as a result of unsatisfactory work performance. Insufficient information was provided to show the claimant was not working to the best of her ability." A copy of the UCSC Notice of Determination is attached hereto as Exhibit 4.

30.

31.    Plaintiff has suffered discrimination, harassment and unlawful or pretext terminations from ten (10) employers since 2016 in which she was a bartender or waitress.

32.    Plaintiff informed the managers at the Rivers Casino of this during her employment as well as after the orientation to her training supervisor, Matthew Fischman ("Matt" or "Fischman").

33.    Plaintiff informed Fischman directly after the last day of orientation and prior to him going over her schedule availability, that she was in school working on her paralegal certification as well as her associate degree and was planning to continue with school and attend law school after transferring to a four-year college and earning her bachelors degree.

34.    During this conversation, Bill Keenan ("Keenan"), the Rivers Casino General Manager (GM) was present and had just finished speaking to the group of new hires at the orientation present with a group of other department supervisors and managers.

35.    During the conversation with Matt, Bill Keenan, the casino's GM was present, and he had just finished speaking to the group of new hires at the orientation with a group of other department supervisors and managers. Fischman had stated to Keenan that

"they" (Rivers Casino) could always use someone in their legal department, and Keenan had informed Plaintiff that yes once she finished school she could see if that was a department she would want to apply and transfer to, he further stated they had just hired a new attorney in their legal department, in which Plaintiff believes he said may be at one of their other casinos or offices located in another state.

36.     He also informed Plaintiff that they reimburse all of their employees who are in school for a semester of tuition, once they had been with the company for over a year.

37.     The conversation above in paragraphs 25-28 was a result of the speech given by Keenan during the new hire orientation, in which Keenan stated that the casino had a "contract" with the employees. Specifically, he said, "This is our contract with you", referring to the handbook and point system that they use for call-offs and tardiness. He further said if employees did not run out of points on the point system or violate any rules of the handbook, they would have a good career with the company and there were many opportunities to move up into various departments or change departments after so many days if they had wanted to.

38.     Plaintiff never used all of her allotted points or violated any rules of the company.

39.     The misrepresentation by Keenan during the orientation as well as the other documents Plaintiff signed was a breach of the contract the casino had Plaintiff and misrepresentation of the company.

40.     Plaintiff had 10 hours of Paid Time Off "PTO" that she had never used at the time of her termination.

41.     Plaintiff was never told that she was not performing well with her "job duties" and was never informed that she needed to work on any areas of improvement prior to her termination.

42.     In fact, Plaintiff was told by Christine, who had trained her for most of her training that she could tell she had previous experience with bartending and a good personality with the customers. She told her that she had done a great job during training.

43.     Plaintiff was also complimented and told by Fischman, training supervisor, that she was doing really well with her job and the customers. Customers had also complimented Plaintiff's work performance to Fischman. This is prior to the altercation that occurred on Saturday, November 2, 2019.

44.     The initial incident of harassment occurred, withing two weeks after Plaintiff started her employment with Defendant. Her co-workers subjected her to various forms of harassment during work and online, which created an intimidating and hostile work environment.

45.   One of the employees had instructed Plaintiff to make sure the person she was going to release from their shift so they could be done for the day had done closing tasks they weren't required to do. This resulted in the individual and another bartender Whitney Lyndsay having conflict with Plaintiff. This led to Tori being called by Whitney to Spiral Bar. Plaintiff had worked Drum Bar for her scheduled shift that evening before going to close Spiral Bar.

46.   Matt Fishman told Plaintiff that she was incorrectly instructed by the other female bartender and that it wasn't Plaintiff's fault that occurred, because the other employee had

been there and should know that, that isn't how the closing process is when cutting someone from their shift who signed the Early Out ("EO") Sheet.

47. This ultimately led to a Facebook post in the Rivers Casino beverage and bartenders group posted by Whitney and a number of other co-workers including Erin Lawther and Ryan Montgomery. Plaintiff has kept photos of theses postings.

48. The only time in which anything negative was ever said to Plaintiff regarding her job performance or duties was when Eric and another female supervisor had observed Plaintiff at the bar cleaning during one of her daytime shifts and had asked to speak with her. They told her that she should be waiting on customers instead of cleaning the bar. Plaintiff then informed them that she was simultaneously doing both cleaning and waiting on the few customers at the bar and told them she could show them her receipts of closed out checks for the past ten minutes. They said it was fine, but when they just "walked by" they noticed her cleaning. She further explained at the time they walked by she was cleaning up stuff that had been spilled earlier prior to her shift and was putting some of the sticky bar utensils and bar mats through the dishwasher. That was the end of the conversation, which they said was fine and not a problem.

49. Two days during one of Plaintiff's day shifts, Eric Martin had brought own brand new metal covers for the bar and had asked Plaintiff to clean them and clean out the other bar wells near her that were empty. Plaintiff agreed with no complications, but thought that it was odd how he was having her clean stuff that wasn't being used and was new, especially when he just corrected her for this the other day.

50.    When the other bar supervisor came on and told Plaintiff she was able to be cut for the day, Plaintiff informed her that everything had already been done and all of her closing tasks and cleaning had been done in addition to the extra cleaning that Eric had asked of her. The supervisor then mentioned, "didn't he just say something to you about cleaning behind the bar the other day?" and seemed confused as well by it.

51.    This supervisor has also complimented Plaintiff during her shifts, however, she was the one on the evening after Plaintiff was terminated that rudely told her she needed to hand her ID badge and her non-gaming license. Plaintiff said she was looking for her cellphone charger that behind the bar and the supervisor said she would have security check but she had to go. During this time Plaintiff was under extreme stress after just losing her job and was crying prior to changing to go home.

52.    Keenan additionally informed all of the new hires that for any employees who were in school or wished to attend school, the Rivers Casino would reimburse an employee for at least a semester of tuition after they had completed the semester and after they were with the company for at least a year. Keenan explained how they wanted employees from within the company that obtained degrees to stay with the company and be able to use their degrees to apply in whichever department they would choose to rather than hiring for the better job positions with people directly from outside of the company.

53.    In May 2020, Plaintiff obtained her paralegal certification in addition to her Associate of Science in Liberal Arts & Sciences (A.S.) from CCAC. She is currently enrolled full-time for the summer and fall 2020 semester at the University of Pittsburgh, in

which she is working to obtain a Bachelor of Arts in Political Science (B.S.) and Minor in Legal Studies.

54.     A copy of Defendant's Team Member Packet provided at the orientation, which provides the rules, regulations and expectations of its employees as well as a map of the casino's floor plan that is included in that packet, is attached hereto as Exhibit 2.

55.     Paul McCue ("McCue") from the HR Department had conducted the two-day orientation and introduced every speaker throughout both days, in which he also spoke and explained about the company's policies and had went over all of the orientation material for the new hires. This information which was divided into various categories and timed specifically for a certain duration throughout each day to accommodate each speaker and to make sure all of the material was covered.

56.     During one segment of the orientation, McCue discussed the union for the Rivers Casino. He adamantly instructed new hires not to sign anything from anyone asking them to join the union for the casino. McCue showed photos of union members and organizers during protests at the casino and specifically stated they were an "enemy" to Defendant, in which placed a scare tactic and intimidation factor on new hires, so they would not join the union in fear of losing their jobs or working in conflict with their job at the casino.

57.     Plaintiff, at the instruction and advice of McCue, assumed that being employed directly by the company was proper, the best way to not have any conflict and was a way to establish a career with the casino. She believed if she were to inquire or even

further choose to sign anything for the union, she would be at risk of being fired. Therefore, Plaintiff could not consider the union after that.

58.    McCue had stated that the union members and organizers harmed the business of the casino and their employees. He gave an example of an incident where they would parade through the casino with protest signs and had sat outside the casino with signs on certain and busy event days.

59.    There are a number of news releases and press articles regarding the casino's unlawful treatment of employees, mistreatment and over the years regarding employees wanting to join the union for their workers, including a news article that states one supervisor instructed security to rip union buttons off of an employee's shirt at work.

60.    On September 16, 2019 and September 17, 2019 is when the mandatory two-day orientation was held for all new hires at the Rivers Casino, whom all of which were new hires in various departments. Plaintiff was the only one during that month of new hires that was in the "Beverage Department".

61.    Seats were assigned for the new team members and identifying name plates were situated on the desks for each new hire to identify their position and what department they were in for the speakers in front of the room throughout each day.

62.     Plaintiff had an odd feeling when she was seated in the front row with a name plate that incorrectly listed her as a "Beverage Busser" rather than a bartender. Plaintiff informed Paul McCue, but he wasn't sure why it was listed that way.

63.    Supervisors and Managers for the entire casino had given speeches throughout the entire day on both days of the orientation. Plaintiff was never reprinted a new name plate, so she had to pencil in her correct job position.

64.    On Saturday, November 9, 2019, Plaintiff worked at the Rivers Casino Drum Bar. Melanie Kleist ("Kleist") was bartending with Plaintiff at the Drum Bar that evening.

65.    The Rivers Casino has video recording and cameras which are constantly monitoring every cash register and bar operations of the casino.

66.    Kleist kept poking Plaintiff in the back throughout the evening while she was at her register, which she had never done before, and Plaintiff assumed it to be that she was letting her know she was behind her until she kept doing it and another bartender did it the following day during her next shift while working at the Drum Bar on Sunday, November 10, 2020, the date of Plaintiff's termination.

67.    Kleist also grabbed Plaintiff by the shoulders, started screaming and vigorously shaking her shoulders while telling her this is how she just had to speak to a customer.

68.    Plaintiff did not truly believe she did that right before to a customer or would she have been able to.

69.    If Kleist would have actually done that to a customer, it would have violated laws and policies of the Rivers Casino.

70.    Therefore, Plaintiff believes that Kleist said that as an excuse so she could yell into Plaintiff's face extremely loud while shaking her by the shoulders.

71.    Plaintiff was subjected to other ongoing and unwanted harassment by management and co-workers in the Beverage Department, which ultimately led to Plaintiff's termination and inaccurately reported 45-day review.

72.    Plaintiff's 45-day review sets forth facts that are not true as well as opinions and contradicting statements.

73.    The reason given by Defendant for Plaintiff's termination was that she had received too many areas of Needs Improvement ("NI") for her 45-day review.

74.    She complained to multiple team members in management, however, no corrective action was taken.

75.    In fact, after a series of incidents on the evening of Saturday, November 2, 2019, Plaintiff was advised and instructed by Tori, a female supervisor for the beverage department, that Plaintiff should not go to the Human Resources Department or to speak with the beverage director until Eric and Abby spoke with her. At the end of that conversation, Tori informed Plaintiff that she would make notes of everything Plaintiff had complained of in the management computer system. She further said that she would make sure Abby and Eric Martin would speak to her regarding the series of events that took place on November 2, 2020.

76.    Specifically, there were two female bartenders that evening Erin Lawther and another unnamed co-worker, who acted in extreme and outrageous conduct by screaming at Plaintiff in front of customers and telling her to do her job and quit talking to customers. It was at this point that Matt Fischman had approached Plaintiff to discuss what was going on, because Erin Lawther went and complained to him regarding Plaintiff. When Plaintiff

informed him of what happened she had gone and spoke with him in the office. At that point Plaintiff as visibly upset and crying, because she was just screamed at by another bartender and told she had to move from where she was bartending at in Sportsbook to the Spiral Bar, which was all smoking.

77.    Even after Plaintiff asked why she was the one that had to be moved, when she wasn't the one screaming, Tori told her that it was so there was no arguing.

78.    Neither Eric nor Abby ever approached or came to speak with Plaintiff regarding anything she reported.

79.    Due to the fact that another team member and male bartender told Plaintiff that Eric would retaliate, because he had retaliated against him before for going above him to report something, Plaintiff had decided to just work her shift without addressing the issue again at that time.

80.    Plaintiff said to Tori that she did not want to make Eric or any of the other supervisors upset for going to HR or to the Beverage Director, but that she was going to at least inform them of what happened so they could make a record of it.

81.    Plaintiff had spoken with Matt directly after Erin and Cynthia had both started yelling at Plaintiff to do her job and quit talking to customers and had moved her from her assigned drawer to the other side of Spiral Bar, without asking her.

82.    During the conversation with Matt in the office he had informed her that eight (8) other bartenders had came and complained to him about her within the past week. Plaintiff said that someone was trying to get her fired, as this had happened before. He said, "Well what does it look like to me when there are eight other bartenders complaining." She

informed him of what happened with Erin and Shelly McBride prior to the altercation, and he said in response about Erin only that, she was one of his "star" bartenders and she had made tons of sales and profits every night.

83.    Plaintiff explained further how she was still being continually harassed and he even acknowledged during an altercation a week prior with Whitney Lyndsay that one of the bartenders who has been there a while improperly instructed Plaintiff on relieving another person from their shift and he doesn't know if she had did that on purpose or not, but it caused Plaintiff to get yelled at and had memes posted on the casino's bartending group. Plaintiff was trying to stop crying to go back on the floor and work, so Matt told her to take a few minutes so she could fix her makeup and compose herself before going back out on the floor.

84.    After that meeting with Matt, Plaintiff went back and worked her shift at the Spiral Bar where comments were still made. At the end of Plaintiff's shift, she was doing her cleaning duties, and Erin and Ryan Montgomery started to laugh and talk about Plaintiff in front of her. He then instructed Erin to see how much I made and they both told her to quit milking tokes for staying on the clock.

85.    Tokes are another term used for "tips" at the casino. There is a tip pull and all tips are divided from the entire day between all bartenders at every restaurant and bar within the casino based upon the amount of hours worked. Plaintiff then informed them that she was doing her closing tasks and wasn't "milking tokes" and that she would rather be off the clock at 3:30 a.m., because it cost more to take an Uber home at that time then what she was making for that time cleaning up.

86.    Erin then came over with her receipt that listed her sales and leaned near Plaintiff's register and said, "so how much did you make in sales". Plaintiff said over $3,000 and Erin said she made over $6,000. She also informed Erin that she had altercations throughout the evening that caused her to not be able to make as much as she normally does and that it wasn't any of her business. She further told her that she also worked an hour less than she did.

87.    Another bartender, Jonathan Penske, who was working Spiral Bar, overheard everything, and he said they do this to new people all the time and they did it to him when he first started. He advised Plaintiff to go to Matt Harvey the Beverage Director or HR, because Martin had retaliated against him before for complaining after he went to them for help with the inaccurate job and performance review regarding the amount of wine that Penske poured by Martin. He said Martin became hostile towards him after he reported the incident. He then had to speak with Matt Harvey regarding Martin and said that he did not have to work there if he was going to be treated like that.

88.    Plaintiff informed Jonathan that she did not want to cause trouble by going over the beverage supervisors to HR or Matt Harvey, but she would speak to a supervisor working that evening first, which was Tori and then go to HR or Harvey.

89.    However, Tori advised and instructed Plaintiff not to go to HR or Matt Harvey.

90.    She further stated that she would have Martin and Abby speak with Plaintiff regarding her concerns and complaint of harassment and false allegations regarding her work performance by Lawther, Cynthia Duffley and Shelley McBride.

91.     Martin and Abby never spoke or met with Plaintiff regarding this.

92.     Tori said she would write a record of everything in the computer system, so that it would be on record. Plaintiff is without knowledge as to the veracity or truthfulness of that assertion by Tori.

93.     When Plaintiff did speak with Martin, he stated he was never informed anything by Tori or anyone else regarding Plaintiff's concerns and complaint.

94.     Martin said he would speak with Abby and would have her speak with Plaintiff, to which she never did.

95.     When Plaintiff spoke with Abby during the evening prior to her termination, Plaintiff asked her if was informed by Martin of Plaintiff's complaints of harassment. She replied that she did not know anything about it and Martin never reported anything to her.

96.     Abby informed Plaintiff during the termination in Matt Harvey's office that Martin had did Plaintiff's 45-day review.

97.     Two weeks prior when Plaintiff asked Fischman if that was part of her review when Martin said something about her cleaning the bar area. Fishman replied, no and he was the one that would be doing her review, because he did all of the new hire 45-day reviews for bartenders.

98.     Fischman had also promised Plaintiff that she would be able to get put onto the training schedule as a cocktail server, but she was never scheduled for training.

99.     Plaintiff informed him that she did not intend to transfer out from being a bartender, but she wanted to be trained for both, so she could pick up server shifts as well.

100.    This reason being, the cocktail servers keep all of their own earned tips and the bartenders split tips from the entire day whether they were working the barge, banquet, buffet or any of the main bars or restaurants of the casino.

101.    When Plaintiff first informed Fischman one evening while working the barge that she didn't mind splitting tips, but on certain nights where she was working the barge and doing an excessive amount of waiting on customers by herself and making at least $500 in tips, she would only be leaving with maybe $200.

102.    This is when he informed her quote, "Well maybe this isn't the right job for you, because we split tips here."

103.    Plaintiff said she did not mind splitting tips, but she informed Fishman that she would like to have one or two shifts as a cocktail server, in which she could keep her own tips. She also reminded him how this was told to everyone at the orientation they could train to work in another department or position.

104.    He said he would put her on the training schedule and that there were a number of bartenders who were trained to work as both, bartender and cocktail server.

105.  A tangible aspect of Plaintiff's employment was conditioned on Plaintiff's response to the harassment and discrimination, which included being removed from a bar she was working to an unpreferable all smoking bar (Spiral Bar) on November 2, 2020.

106.  On November 2, 2019, I was scheduled to work at Sportsbook. Shelley McBride complained to Tori (supervisor) and I was moved to Spiral with Erin Lawther, Cynthia Duffley and Jonathan Penske.

107. Another tangible aspect, change in schedule conditions in which she was promised she would have at least one to two accommodations made. Those accommodations included at least one day shift and evening shifts where she would be able to start earlier so she could be done before 2 am when the Port Authority's Light Rail System stopped running. She informed the supervisor who made the schedule that it was expensive paying for a cab or other public transportation home every night when she worked until 3:00 a.m. After Plaintiff complained and reported the harassment, her final schedule not only put Plaintiff in the smoking bar that she requested not to be in, but none of the other accommodations were made.

108. Plaintiff received Facebook messages from a co-worker, John Gudenburr, that informed her other co-workers were in the Facebook Group for Rivers Casino Bartenders and Beverage Department posting memes and other things to cause embarrassment and defamation to Plaintiff.

109. He further informed Plaintiff that they "played favorites" there. Plaintiff has a copy of those messages.

110. Another male co-worker messaged Plaintiff after she first began her employment with Defendant who was a table games dealer and started questioning Plaintiff about her "personal" life, in which she thought it was in appropriate and had deleted him from Facebook.

111. Plaintiff also reported Facebook the unlawful termination and harassment to Al Pagan, who instructed Plaintiff to speak with Jovelin Pettis from HR and she would schedule an in-person meeting.

112. When Plaintiff spoke with Jovelin Pettis, she did not schedule a meeting nor did she take any of Plaintiff's reports regarding the harassment into consideration. Further she was on a conference call with another employee from HR who previously was promoted from the Head of Security Department.

113. Martin at all times relevant, was dating one of the female employees from HR.

114. During the phone conference, they had ridiculed Plaintiff after she was terminated and disregarded each statement and objection of her unlawful and retaliatory termination.

115. Additionally, he said that they couldn't control what their employees did on social media.

116. They did not even take her harassment complaint and investigate her termination as they were supposed to.

117. During the meeting with Matt Harvey, he asked Plaintiff how her shift was. She informed him that it was busy at the Drum Bar due to the Steeler game being at home and that the band that played had attracted a good crowd.

118. Abby Delusio then took over the conversation by informing her that she was there to be read her "45 Day Review". At the end of being read her 45 day review she was told she was being terminated.

119. One section of the 45-day review had stated, "This has created an unpleasant work environment for other team members and is adversely affecting guests service, and that she continues to struggle in improving in those areas and is scoring needs improvement overall."

120. Plaintiff highly contends the rest of the 45-day review is inaccurate and was intentionally misevaluated due to her reporting of harassment, if not premeditated.

121. When Plaintiff was first hired after three interviews, she was going to do her onboarding process with HR, where she received her drug screening. The lady who gave her the drug screen is the one who made a comment regarding Plaintiff's hiring that it was, "just for fun".

122. Another HR employee had stated that same phrase to Plaintiff in the elevator on the way up to HR, that it was "just for the fun of it", however, while Plaintiff thought it was kind of odd, she did not pay it much attention.

123. Plaintiff was never given a copy of her review until after calling HR twice.

124. HR still did not release the 45-day review after the initial phone conference with Plaintiff.

125. It was not until Plaintiff spoke with Dan Nogal from HR, who informed her he had "heard about her termination", but was not sure exactly the details of what happened. He had mailed Plaintiff out a copy of her 45-day review.

126. If the 45 day review was from the day Plaintiff began her first non-training shift at the barge on October 4, 2019, then her 45 day review would bring her to November 17, 2019, instead of the day she received it on Sunday November 10, 2019.

127. Plaintiff was informed that 45-day reviews are not to terminate employees, it is to show where you may need to improve for your 90-day review. There are at least 30-40 bartenders scheduled daily, if not more.

128. If the 45 days for the review from the day Plaintiff's first employed shift at Orientation on September 17, 2019, then her 45 day review would bring me her to October 31, 2019, instead of the day she received it on Sunday November 10, 2019, which was 2 days after Plaintiff had reported the harassment to Martin and informed him she planned to go to HR but wanted to speak with him first.

129. Harvey also stated in his office after Plaintiff opposed her termination and said that this was an improper evaluation and discriminatory and retaliatory termination quote the same as previous employer MBFG that, "it just wasn't the right for the company".

130. Harvey then wrote down the name and number for Jovelin Pettis from HR, whom he said handles the appeal and challenging of a termination process for wrongful and discriminatory terminations.

131. Plaintiff reserves the right to supplement or amend any parts of this Complaint.

132. Plaintiff also advances the above paragraph, because due to time constraints, she was not able to completely revise this Complaint and restate with specificity the allegations set forth above to each cause of action.


**CAUSE OF ACTION**

## I.    FIRST CLAIM FOR RELIEF-VIOLATION OF TITLE I OF THE ADA FOR RETALIATION

133.  Plaintiff incorporates by references the above paragraphs as if the same has been set forth herein.

134.  Plaintiff is a qualified individual under the (ADA).

135. Defendant was made aware of Plaintiff's processing of an employment discrimination charge against a previous employer as well as being informed of other previous employers discriminating against her, harassing her and unlawfully terminating her.

136. Defendant was made aware of Plaintiff's disability, including an onset of Persistent Postural Perceptual Dizziness (PPPD), which is sometimes exacerbated by stress or anxiety.

137. Defendant was aware of medications prescribed to Plaintiff for depression and as needed for anxiety. Abby, Fishman and Tori were all informed separately of this.

138. Plaintiff's trainer, Christine was also informed of this in addition to other employees.

139. Defendant was also made aware of Plaintiff's PTSD from previous work experiences of harassment, terminations and intentional employment sabotage.

140. Plaintiff was continually harassed while working.

141. The harassment was reported to Defendant.

142. No action was taken against any individuals or reported.

143. Plaintiff was advised not to go to HR.

144. Plaintiff reported harassment to multiple managers.

145. Plaintiff was terminated two days after the final inquiry/reporting to management as to why they were never informed of Plaintiff's complaints.

146. The anti-retaliation provisions of the employment discrimination statutes seek to prevent an employer from interfering with an employee's efforts to secure or advance

enforcement of the statutes' basic guarantees and are not limited to actions affecting employment terms and conditions.  Burlington Northern & Santa Fe Railroad. Co. v. White, 548 U. S. 53, 126 S. Ct. 2405 (2006).

147. To state a viable claim of retaliation, a complainant must allege that: 1) s/he was subjected to an action which a reasonable employee would have found materially adverse, and 2) the action could dissuade a reasonable employee from making or supporting a charge of discrimination. Id.

148. Defendant discharged Plaintiff because she had made multiple complaints of disability discrimination and a hostile work environment.

149.  Under the ADA, **compensatory damages** are available for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses" 42 U.S.C.A §1981(a)(b)(3).

150.  A plaintiff who establishes unlawful termination is entitled to an award of **back pay from the date of the termination until the date of judgment**. Saulpaugh v. Monroe Community Hospital, 4 F.d 134, 144-45 (2d Cir. 1993).

151.  Pursuant to the Civil Rights Act of 1991, a plaintiff may be entitled to **punitive damages** under the ADA if "the respondent engaged in a discriminatory practice…with malice or with reckless indifference to the plaintiff's federally protected rights." 42 U.S.C.A §1981(a)(b)(1).

**SECOND CLAIM FOR RELIEF-VIOLATION OF TITLE I OF THE ADA FOR HOSTILE WORK ENVIRONMENT**

152. Plaintiff incorporates by references the above paragraphs as if the same has been

set forth herein.

### THIRD CLAIM FOR RELIEF-VIOLATION OF TITLE I OF THE ADA FOR UNLAWFUL TERMINATION

132.    Plaintiff incorporates by references the above paragraphs as if the same has

been set forth herein.

### FOURTH CLAIM FOR RELIEF-VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 FOR HOSTILE WORK ENVIRONMENT

153. Plaintiff incorporates by references the above paragraphs as if the same has been

set forth herein.

### FIFTH CLAIM FOR RELIEF- BREACH OF CONTRACT

154. Plaintiff incorporates by references the above paragraphs as if the same has been

set forth herein.

155. Defendant has a contract with Plaintiff for her employment and it was

misrepresented and breached by Defendant.

### <u>REQUEST FOR RELIEF</u>

Compensatory Damages
Punitive Damages

### <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury on all questions of fact raised by this Complaint.

*WHEREFORE,* Ms. Silla respectfully requests this Honorable Court grant all relief that is

available to these actions and any further equitable relief it deems appropriate. Plaintiff

also reserves the right to amend or supplement this section for relief and damages.
Plaintiff demands judgment against Defendant and requests the following:

a.  A declaration against Defendant, declaring Defendant's actions to be unlawful and
    a violation under the ADAAA and Title VII of the Civil Rights of 1964.
b.  An award of compensatory damages.
c.  An award of pecuniary losses.
d.  An award of punitive damages.

Dated: June 26, 2020                                  Respectfully submitted,

                                                      */s/ ReJeana M. Silla*
                                                      REJEANA M. SILLA
                                                      *Pro Se*

                                                      430 TAYLOR STREET
                                                      PITTSBURGH, PA 15224
                                                      (412) 923-7935